UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SHEILA GARCIA, CASSANDRA GARCIA, C.N.G., a minor, and C.J.G., a minor, by and through their Guardian Ad Litem, DONALD WALKER

Plaintiffs,

v.

COUNTY OF SAN DIEGO, SAN DIEGO HEALTH AND HUMAN SERVICES AGENCY, POLINKSY CHILDREN'S CENTER, CAITLIN MCCANN, GLORIA ESCAMILLA-HUIDOR, SRISUDA WALSH, JESUS SALCIDO, MARTHA PALAFOX, LAURA QUINTANILLA, and Does 1 through 10, inclusive,

Defendants.

Case No.: 15-CV-189 JLS (NLS)

**ORDER: (1) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; (2) GRANTING IN PART AND DENYING IN PART COUNTY OF SAN DIEGO'S MOTION FOR SUMMARY JUDGMENT; AND (3) GRANTING IN PART AND DENYING IN PART INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

(ECF Nos. 113, 118, 121)

Presently before the Court are cross-motions for summary judgment. Plaintiffs have filed a Motion for Summary Judgment, ("Pl. MSJ," ECF No. 113), and Defendants have filed two MSJs. The first is by the County of San Diego, ("County MSJ," ECF No. 118). The second is by Defendants Caitlin McCann, Gloria Escamilla-Huidor, Jesus Salcido, Martha Palafox, Laura Quintanilla, and Srisuda Walsh, ("Individuals MSJ," ECF No. 121).

1

Plaintiffs filed Responses in Opposition to Defendants' MSJs, ("Pl. Opp'n to County," ECF No. 148; "Pl. Opp'n to Individ.," ECF No. 148-1). Defendants collectively filed a Response in Opposition to Plaintiffs' MSJ, ("Def. Opp'n," ECF No. 151). Plaintiffs filed a Reply in Support of their MSJ, ("Pl. Reply," ECF No. 157), as did the County, ("County Reply," ECF No. 158), and the Individual Defendants, ("Individuals Reply," ECF No. 161).

The Court held oral argument on the Motions on June 7, 2018. After considering the Parties' arguments and the law, the Court rules as follows.

## BACKGROUND

Plaintiffs Sheila Garcia, Cassandra Garcia, CNG, a minor, and CJG, a minor, filed a Complaint against the County of San Diego, San Diego Health and Human Services Agency, Polinsky Children's Center, and various individuals: Caitlin McCann, Gloria Escamilla-Huidor, Jesus Salcido, Martha Palafox, Laura Quintanilla (now Laura Morris), and Srisuda Walsh (hereinafter, "Individual Defendants"). ("Compl.," ECF No. 1.)

Plaintiffs Cassandra Garcia ("Cassandra") and CNG and CJG ("Minors") resided with their mother, Plaintiff Sheila Garcia ("Sheila") and their father, Rudy Garcia ("Rudy"). Cassandra had mental health problems, depression, and anxiety, and was hospitalized for six days in the psychiatric ward of Rady's Children's Hospital in early October 2012. (Pl. MSJ 6.)[1] When Cassandra returned to school after these six days, she told people she was pregnant to explain why she had been absent. (*Id.* at 7.) On or about October 17, 2012, Sheila and Rudy found out about this, confronted Cassandra, and "an emotional discussion ensued." (*Id.*) Sheila and Rudy were drinking during the discussion, having one or two drinks each. (*Id.*) After the argument, Cassandra went upstairs and laid down in her parents' bed where her sisters CNG and CJG were asleep. When Rudy went to bed later, he saw a figure which he believed to be his wife, and went to wake her up,

---

[1] Pin citations refer to the CM/ECF page numbers electronically stamped at the top of each page.

then "took one picture of who he believed" was his wife, and walked out.[2] (*Id.* at 8) Cassandra had woken up when Rudy touched her, and "didn't know what was going on." (*Id.*)

The next day, Rudy apologized, and Cassandra "said it was OK" but when she told Sheila, Sheila asked Rudy to leave the house. (*Id.*) Rudy went to stay with his cousin. Later, Rudy "explained the mistaken identity" and Cassandra confirmed her understanding that Rudy had mistaken her for her mother. (*Id.*) After October 2012, Cassandra continued to receive psychiatric and therapeutic care, but still struggled with anxiety and depression. On January 21, 2013, the Garcias took Cassandra to the emergency room "because she had threatened to walk into traffic or take pills" and Cassandra was placed on a psychiatric hold. (*Id.* at 8.) On January 22, 2013, Cassandra was hospitalized for emotional problems and the next day she told a hospital social worker (Debra Bernaderet) about the October 2012 incident with her father. She stated her "parents drink [until] vomiting regularly" and one evening, her mother "became ill from drinking" and her father came into the room and "began to 'fondle [Cassandra] and take nude pictures of her.'" (*Id.* (quoting ECF No. 125-42, at 13 (social work form/psychosocial assessment completed by Bernaderet)).) Bernaderet reported Cassandra was crying profusely during the conversation and that she expressed anxiety that this would be reported to Child Protective Services ("CPS"). (*Id.*) Bernaderet made a mandatory referral to CPS by calling the hotline and filing a report.

Defendant McCann, who worked for the Health and Human Services Agency ("HHSA"), was assigned to the case on January 23, 2013. (*Id.* at 9.) McCann's supervisor was Defendant Gloria Escamilla-Huidor. McCann interviewed Cassandra on January 28, 2013. (*Id.*) At this time, McCann was accompanied by a detective from the Chula Vista

---

[2] Rudy states he took this picture because he and his wife play a "little game where if you were asleep in an odd position" or "look funny" they would "take a picture of each other and then . . . clown each other later." ("Rudy Depo.," ECF No. 125-10, at 27.) It is unclear to the Court how Rudy believed the person in the bed was in an "odd position" when he also testified the room was dark. (*Id.* at 25.) He also testified that he was able to see his other two daughters in the bed, one lying on her side and one lying on her back. (*Id.*)

Police Department, Detective Hinzman.  In Hinzman's follow-up report, she summarized Cassandra's statement as follows: father started drinking, mother went to bed in Cassandra's bed, and father was unaware Cassandra and the mother had switched beds. Father went into the room and "rubbed Cassandra's leg and her stomach.  He took one photo of Cassandra's leg."  He realized he was "fooling w/ the wrong person" and went downstairs, then apologized to Cassandra the next morning.  This was an "isolated incident" and "Cassandra feels it was accidental."  (ECF No. 125-40, at 3.)

McCann states she spoke to Cassandra privately after the interview and Cassandra made other disclosures.  (Pl. MSJ 10.)  Cassandra stated that in October 2012, she and her parents were arguing because Cassandra had told her friends she was pregnant, which was not true.  (McCann Decl. ¶ 10.)  During this argument, her father was "pounding down whiskey shots" and her mother was drinking too and eventually threw up.  (*Id.*)  Cassandra then relayed the story of Rudy touching her while she lay in her parents' bed, stating Rudy "lifted up her shirt and began to rub her stomach. As he did so, he was rubbing the underside of her breasts."  He then took a picture of her and left. The next morning, Rudy apologized and said he was "just really drunk" and deleted the picture he had taken of Cassandra in the bed.  Cassandra and Rudy both moved out separately, and moved back after a couple weeks.  Rudy stopped drinking, but then began drinking again.  Cassandra said her parents drank nightly, drinking wine and whiskey, and "when her parents drank, she would feed her sisters, then bring them down to her room, watch a movie with them, and put them to bed."  (*Id.*)

Plaintiffs have included a declaration by Cassandra who states McCann did not interview her separately and apart from Detective Hinzman and she "never told McCann that [her] father rubbed the underside of [her] breasts."  ("Cassandra Decl.," ECF No. 148-3, ¶¶ 4–5.)[3]  Hinzman's statement also includes none of the details reported by McCann.

---

[3] At her deposition, Cassandra states she told McCann that the incident was an "accident."  (ECF No. 125-9, at 36.)

Hinzman later testified that she does not know whether McCann spoke to Cassandra before or after Hinzman arrived at the hospital but she does not think this occurred. (ECF No. 125-17, at 8.)

McCann states she met with Bernaderet who completed a psychosocial assessment of Cassandra upon Cassandra's admittance to the hospital on January 22, 2013. Bernaderet asked Cassandra about her parents' drinking, and in response, Cassandra told Bernaderet about the night where her father drank, came into the bedroom, and touched her and took photos. (*Id.* ¶ 11.) When asked if her father touched her sisters inappropriately, Cassandra "responded by sobbing hysterically." (*Id.*) Bernaderet also told McCann "that Cassandra had disclosed to a nurse that her father had ejaculated during the incident." (*Id.*) There is no evidence that McCann attempted to locate this nurse to confirm this statement. At Bernaderet's deposition, she testified that if Cassandra or a nurse had told her Rudy had ejaculated on Cassandra, she would have documented that somewhere, but she did not do so. (ECF No. 125-1, at 9–10.) Cassandra states her father did not ejaculate on her and she never told a nurse that he did. (Cassandra Decl. ¶ 6.)

McCann then met with CNG at her school, who stated her father had not inappropriately touched her. ("McCann Depo.," ECF No. 125-15, at 38.) CNG was free of visible marks/bruises, denied that her parents drink to the point of vomiting, and denied sexual abuse. (ECF No. 125-36, at 8.) CNG recalled the incident between her father and Cassandra where "dad thought Cassandra was mom" and denied all other forms of abuse or neglect. (*Id.*) She was not scared of anyone and felt safe at home. She stated her parents had never talked with her about speaking to social workers. (*Id.* at 7.)[4]

McCann then went to CJG's daycare and did a body check of CJG. (Pl. MSJ 10.) She found no visible marks/bruises, and the daycare provider described the Garcia parents as "very nice and cooperative." (ECF No. 125-36, at 8.) McCann then met with Sheila

---

[4] McCann states Rudy told McCann he overheard his wife tell their daughters not to talk to social workers. (McCann Decl. ¶ 14.) Rudy told his daughters to talk to social workers and be honest. (*Id.*)

and Rudy at their home. Rudy and Sheila agreed with McCann that Rudy would move out of the house while McCann continued her investigation. (Pl. MSJ 11.) Rudy and Sheila then asked if Rudy could continue to pick up the kids from school. (*Id.*) As alleged by Plaintiffs, in response to this question, McCann and her supervisor Huidor then decided that Minors would be removed from their parents' custody and that the agency would also take control over Cassandra. (Pl. MSJ 12, 13.) The Garcias obviously disagreed with this decision and allege fabrication of evidence on the part of McCann. (*Id.*)

Minors were taken to Polinsky Children's Center ("PCC"). According to Plaintiffs, Huidor then called Sharp Mesa Vista "and told the hospital that Child Protective Services was taking custody of Cassandra and she should not be discharged without CPS approval." (*Id.* at 14.) Cassandra had been scheduled to go to Project Oz, a residential program, but "Huidor and McCann countermanded that order" and placed Cassandra at PCC. (*Id.*) Plaintiffs allege the children were subject to unauthorized examination and testing while at PCC and make other allegations regarding Defendants' conduct while the children were at PCC. (Compl. ¶¶ 27–30.) After the children were placed at PCC, the case was transferred from McCann to Defendant social worker Jesus Salcido. (*Id.* ¶ 32.)

On February 14, 2013, Cassandra left PCC without permission (referred to as going "AWOL"). The next day, the children were moved out of PCC and into their grandmother's home. (*Id.*) In the next month, Cassandra was placed on a 5150 hold on three occasions "due to suicidal ideations." (Pl. MSJ 17.)[5] Plaintiffs allege Salcido did not visit Cassandra and he could not be reached to discuss Cassandra's care. (*Id.*) Cassandra was hospitalized for psychiatric reasons on March 20, 2013. (*Id.*)

On March 22, 2013, Cassandra was re-entered into PCC "due to being a high level risk" after being readmitted to the hospital. (Compl. ¶ 33.) Cassandra continued to demonstrate self-harm while at PCC. (Pl. MSJ 17.) Cassandra then went AWOL on March

---

[5] A "5150 hold" refers to section 5150 of the California Welfare and Institutions Code which allows for 72–hour evaluation of a person believed to be a danger to herself or others.

24. (*Id.*)  On March 27, Cassandra was admitted to the hospital due to another emotional breakdown but was readmitted to PCC on March 30. (*Id.* at 18.)  She informed Rady's and PCC staff that "she intended to AWOL from PCC." (*Id.*)  On March 30, Cassandra again went AWOL with two other girls.  While out, they met several young males and walked to their apartment, where Cassandra was raped. (*Id.*; "Cassandra Depo.," ECF No. 127, at 55.)  Plaintiffs allege Cassandra was in the custody of Defendants during this time and Sheila was not informed of any of this.  Cassandra was then examined at Rady's, discharged on April 1, 2013, and returned to PCC. (Pl. MSJ 18.)  Again, Cassandra went AWOL and "ended up again in a psychiatric facility." (*Id.*)  Cassandra was then prescribed a new medication and received outside therapy. (*Id.*)

On March 25, 2013, the sexual abuse allegations were dropped against Rudy and about a month later, the Garcias' case was assigned to a new social worker. (*Id.*)  The social worker helped get Cassandra into a group home, and arranged visits between the children and their parents.  Sheila returned home on July 18, 2013, and Cassandra returned home on September 20, 2013.  A month later, Rudy was allowed to return home. (*Id.* at 18–19.)  In 2014, the Garcia case was closed. (*Id.* at 19.)

Plaintiffs bring many causes of action against all Defendants.[6]  These are: (1) Assault; (2) Battery; (3) False Imprisonment; (4) Violation of Civil Rights (First and Fourth Amendment); (5) Violation of Civil Rights (14th Amendment Due Process); (6) Violation of Civil Rights (14th Amendment Substantive Due Process); (7) *Monell* related claims; (8) Intentional Infliction of Emotional Distress; (9) Violation of State Civil Rights (Civil Code § 43); (10); Violation of State Civil Rights (Civil Code §§ 51.7, 52); (11) Violation of State Civil Rights (Civil Code § 52.1); and (12) Injunctive Relief.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a party may move for summary

---

[6] The County of San Diego has responded noting it was erroneously sued as "San Diego Health and Human Services Agency" and "Polinsky Children's Center."

judgment as to a claim or defense or part of a claim or defense. Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact. *Id.* When a plaintiff seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.

**ANALYSIS**

The Court first addresses Plaintiffs' MSJ; within this analysis the Court will address various requests for summary judgment by the Individual Defendants. The Court will then address the claims of municipal liability, and will conclude by addressing any remaining issues in the Individual Defendants' MSJ.

**I.     Plaintiffs' MSJ**

### A. The Garcia Children's Fourth Amendment Claim

Plaintiffs allege McCann and Huidor violated the Garcia children's Fourth Amendment rights by unlawfully removing the children from their home. (Pl. MSJ 20.)

"Officials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury." *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000). "The existence of reasonable cause, and the related questions, are all questions of fact to be determined by the jury." *Id.* (citing *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984); and *Smiddy v. Varney*, 665 F.2d 261, 265 (9th Cir. 1981)). "Summary judgment in favor of the defendants is improper unless, viewing the evidence in the light most favorable to the plaintiffs, it is clear that no reasonable jury could conclude that the plaintiffs' constitutional rights were violated." *Id.*

The *Wallis* court found that summary judgment was improper if a material question of fact exists whether (1) there was reasonable cause to believe, on the basis of the information in the possession of the officers, that the children faced an immediate threat of serious physical harm or death, or, (2) the officers' actions of removing the children from their mother "exceeded the permissible scope of the action necessary to protect them from that immediate threat." *Id.* There must be "specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse" before the state may remove children from their parents' custody without a court order. *Id.* Also,

"reasonable avenues of investigation" must be first perused. *Id.*

### 1. Exigency for CNG and CJG

Plaintiffs first argue McCann and Huidor did not have exigency to remove CNG and CJG. Plaintiffs point to the January 22, 2013 referral by Bernaderet, which stated Cassandra was "unable to disclose" if her father's behavior had happened to her or her sisters. (Pl. MSJ 21.) Further, in CNG's interview, she told McCann there was no sexual misconduct in their home. Plaintiffs argue McCann's interview of the Garcias at their home did not provide a basis for concern regarding imminent injuries because the Garcias cooperated fully with McCann, Rudy agreed to move out of the home, and both agreed to refrain from alcohol. (*Id.* at 21–22.) Plaintiffs also argue that Sheila told McCann that Sheila's mother was driving down to stay with the children and that CJG was in a licensed daycare. (*Id.*)

In response, Defendants point to McCann's declaration where she recounts her interviews with Bernaderet and the Garcias. McCann states that Bernaderet told her that Cassandra "sobbed hysterically" when asked if her father had touched her sisters inappropriately. (McCann Decl. ¶ 11.) In McCann's interview with Sheila, McCann states Sheila described the incident with Rudy and Cassandra as a "mistake" after Rudy had been drinking "heavily." (*Id.* at ¶ 13.) She said Rudy thought Cassandra was Sheila and "ended up rubbing her leg and tummy." (*Id.*) She said Cassandra did not like living in San Diego, hated her parents, and was using the incident "to her advantage" and would often "claim she was suicidal in order to get attention." (*Id.*) Sheila denied drinking to excess or vomiting recently due to alcohol. (*Id.*) Sheila "continued to speak poorly about Cassandra." (*Id.*) In McCann's interview with Rudy, he confirmed Cassandra's past suicide attempts, and agreed Cassandra was using the touching incident as "manipulation" and "a tactic" to move back to San Bernardino. (*Id.* ¶ 15.)

McCann was "concerned for the safety" of the children and asked Rudy to leave the home while she conducted the investigation. (*Id.* ¶ 16.) He agreed, but the parents then said Rudy picked up their daughter from daycare and stayed with the children at home until

Sheila got home from work. The parents did not have anyone else who would do this. When McCann suggested the daycare provider, Ms. Campos, who cared for CJG, the parents agreed, but McCann "was not able to communicate with [Ms. Campos] because she spoke only limited English." (*Id.*) Plaintiffs contest this and include a declaration by Ms. Campos who states she and McCann spoke English to each other when McCann came to check CJG for signs of abuse. ("Campos Decl.," ECF No. 148-5, ¶ 7.) Ms. Campos declares that had she been asked to care for the children while Sheila was at work, she would have done so. (*Id.* ¶ 9.)

McCann could not put a safety plan in place because no one else could pick up and stay with the girls after school. As a result, she (after speaking with Huidor) "agreed that the children needed to be temporarily removed and placed in protective custody." (McCann Decl. ¶ 17; *see also* ECF No. 125-36, at 46 (safety plan form filled out by McCann, but the last column states "safety plan not completed as it appear[s] parents would not follow safety parameters").) McCann believed "the children were not safe because of the overwhelming concerns regarding sexual abuse, Cassandra's mental health, the parents' alcohol consumption, their discrediting of Cassandra, Mrs. Garcia's telling the children not to talk with authorities, Mr. Garcia's ample contact alone with children, and the parents' inability to make the safety plan work." (McCann Decl. ¶ 17.) McCann states she believed that the "parents might get drunk again, and that Mr. Garcia might abuse one or more of the children in the 48–72 hours it would typically take to get a warrant." (Def. Opp'n 13.) McCann received Huidor's approval in removing the children. (*See* "Huidor Decl.," ECF No. 121-3, ¶ 7 ("Agency practice is that social workers must obtain supervisor approval before removing children based on exigency.").)

Plaintiffs argue no exigency occurred and refer to the fact that McCann did not conduct the interviews of the Garcias until January 28 after receiving the referral on January 22. (Pl. Reply 6.) Defendants argue this block of time is not important; what is important is that McCann removed the children on the same day she conducted the investigation. (Def. Opp'n 10). Defendants also note that the referral was classified as a

"10-day referral" because Cassandra was admitted to an inpatient facility at the time, so she was not in imminent danger of being sexually abused by her father at that time the referral was received. (*Id.* at 9–10.)

The Ninth Circuit has found that a delay in investigating the case and removing the children supports a finding of no exigency. In *Rogers v. County of San Joaquin*, as here, the situation was classified as a ten-day response. 487 F.3d 1288, 1296 (9th Cir. 2007). The court noted this indicated the officials "did not think that any exigency existed" and the social worker then waited eleven days to visit the house, and returned seven days later. This delay shows that neither the social worker nor the other staff members "thought that the allegations required immediate action." *Id.* The court concluded that the exigent circumstances required to remove the children did not exist. *Id.; see also Calabretta v. Floyd*, 189 F.3d 808, 813 (9th Cir. 1999) (holding that a 14–day delay by social workers in entering the family home to investigate a report of abuse is evidence of lack of exigency). It is true that the present case was classified as a 10–day referral, which indicates the officials who made the report did not deem the children to be in immediate danger. Although Cassandra was in a facility at the time the referral was made, and may not have been in danger, the referral mentioned Minors and therefore it must have been clear to the official that Minors could be in contact with the father, unlike Cassandra. (*See* McCann Decl. ¶ 5 (discussing the Referral).) And, although McCann waited six days after receiving the report before investigating, once she began, she met with Cassandra, Bernaderet, Minors, and the Garcia parents all in one day, and Minors were taken to PCC that evening. Cassandra was taken to PCC the next day. (*Id.* ¶ 19.) The timing here is therefore distinguishable from that in *Rogers*.

There must be "specific, articulable evidence" that provides reasonable cause to believe a child is in imminent danger before the state may remove children from their parents' custody without a court order. *Wallis*, 202 F.3d at 1138; *see Mueller v. Auker*, 700 F.3d 1180, 1186 (9th Cir. 2012) (the question is "did the officers have an objectively reasonable basis for fearing that [the child] was in imminent danger"); *see also Rogers*,

487 F.3d at 1294 ("Officials, including social workers, who remove a child from its home without a warrant must have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant."). There must be an "identifiable risk of serious harm or abuse" in the time period before the warrant can be obtained, no matter how long that period is. *Demaree v. Pederson*, 887 F.3d 870, 883 (9th Cir. 2018). Here, the period to receive a warrant was 24 to 72 hours. (*See* Individuals MSJ 10.)

Defendants argue that McCann had information that Rudy had drank, and then fondled Cassandra, and took pictures of her. (Def. Opp'n 12.) McCann interviewed the social worker who had spoken to Cassandra. When McCann spoke to the Garcias, she felt the parents "minimized" the incident and "disparaged" Cassandra. (*Id.* at 13.) Although Rudy agreed to leave the house, the parents also discussed Rudy continuing to pick the children up from school, so it was reasonable for McCann to think he would still have contact with the children. McCann states she was unable to put a safety plan in place. Defendants argue this is specific evidence that made it objectively reasonable for McCann to remove the children, who reasonably believed the children were in imminent danger during the time it would take her to receive a warrant.

Plaintiffs dispute McCann's version of the facts and her choices, saying the daycare provider did in fact speak English and McCann could have waited for the children's grandmother to arrive.[7] Plaintiffs cite to testimony by McCann's intern, who testified McCann was thinking about the situation the next day and was "thinking if she had made the right decision." (ECF No. 125, at 6.) Plaintiffs argue McCann's declaration should not be taken as true because it is contradicted by other evidence. (Pl. Reply 7.) Indeed, the Court is troubled by McCann's statement that she was told Cassandra's father had

---

[7] McCann states that she was not informed about the grandmother coming down until after the removal decision had been made. (McCann Decl. ¶ 18.) She also testified she was only informed the grandmother was "on her way" into town and knew that she could not complete a mandatory background check for the grandmother because it was after hours. (Def. Opp'n 14.)

ejaculated on her. There is no evidence that this is true, and it is unclear why McCann would not attempt to locate this nurse after hearing such a gruesome detail. Bernaderet stated if she had been told about an ejaculation event, she would have put it in her report, which she did not. (ECF No. 125-1, at 7.) Plaintiffs also produced Sharp Mesa Vista records, which do not contain the disclosure. (Pl. MSJ 10; ECF No. 125-42, at 2 (Sharp Mesa Care Plan).) But, on the other hand, there is evidence in the record to support the remainder of McCann's declaration; after all, this case began with Bernaderet's report that detailed Cassandra's disclosure of the incident with Rudy.

Another court in this district has found that "whether reasonable cause to believe exigent circumstances existed is generally a question of fact for the jury." *Parkes v. Cnty. of San Diego*, 345 F. Supp. 2d 1071, 1089 (S.D. Cal. 2004) (citing *Mabe v. San Bernardino Cnty., Dep't of Public Social Servs.*, 237 F.3d 1101, 1108 (9th Cir. 2001)). The Court finds this general proposition to be true here as well. There is a genuine issue of material fact as to whether a reasonable social worker could believe her action in removing the children from the parents' custody in this situation was lawful. *See Wallis*, 202 F.3d at 1138 (holding summary judgment is improper unless, viewing the evidence in light most favorable to the other party, "it is clear that no reasonable jury could conclude that the plaintiffs' constitutional rights were violated").[8] The Court finds that a question of material fact exists as to the reasonableness of McCann's decision in removing Minors from the Garcia home without a warrant.

---

[8] Also, as Plaintiffs point out, children may not be seized "unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been—or will be—committed." *Wallis*, 202 F.3d at 1138. The Court finds there is an issue of material fact as to whether the social workers pursued every reasonable avenue of investigation. Whether a reasonable avenue exists "depends in part upon the time element and nature of the allegations." *Id.* Plaintiffs argue that McCann should have done more, such as ask the daycare provider to care for the children, McCann declares that this was not feasible because there was a language barrier with the daycare provider. Plaintiffs argue McCann could have waited for the children's grandmother to arrive and care for the children, but McCann declares she was not informed of this until after she had made the decision to remove the children and was not convinced the grandmother was an adequate caretaker. Given the disparities in evidence, an issue of material fact exists.

14

### 2. *Exigency for Cassandra*

Plaintiffs argue Cassandra was also not in imminent danger when she was removed to PCC by CPS.  Plaintiffs point to the fact that the referral was made on January 22, 2013 and McCann did not interview Cassandra until January 28.  (Pl. MSJ 22.)  At that time, Cassandra was still in the hospital and was expected to be discharged to Project Oz.  (*Id.* at 23.)

Defendants agree that Cassandra was at the psychiatric unit at the time she was removed to PCC, and agree that the plan was to discharge Cassandra to Project Oz.  (Def. Opp'n 14.)  But Defendants note that Cassandra was on a voluntary hold in the psychiatric unit and was to be discharged to Project Oz on a voluntary basis "meaning that she could leave and return home or that her parents could check her out of either program at any time."  (*Id.* (citing the deposition of Dr. Michael Juboori, a doctor at Sharp Mesa Vista).) Plaintiffs argue this is speculative and does not qualify as evidence of imminent danger. (Pl. Reply 9 (citing *Bailey v. Newland*, 263 F.3d 1022, 1033 (9th Cir. 2001) (showing exigent circumstances is not satisfied by "mere speculation that the exigency exists")).)

As noted above, the question is whether it was reasonable for McCann to release Cassandra to PCC.  There is no indication the Garcias intended to check Cassandra out of the psychiatric unit.  However, it is unclear how simple the process would be for them to check her out should they have so desired; after all, Cassandra was released to CPS the day after McCann began her investigation.  It is possible the Garcias could have likewise discharged Cassandra immediately.  There is also no evidence that Cassandra intended to leave the hospital on her own nor is there any information as to whether she wanted to go to Project Oz or return home.  But, it is reasonable to assume that Cassandra was feeling conflicted and troubled at the time regarding her family situation.  The Court raises this issues because they go to the weight of evidence and create a dispute of material fact as to the reasonableness of McCann's decision.  The Court **DENIES** Plaintiffs' Motion for

Summary Judgment for the Fourth Amendment claim as to all three Garcia children.[9]

The Court also **DENIES** the County's Motion for Summary Judgment as to Plaintiffs' allegation that in 2013, the County had a policy, practice, or custom of "detaining and/or removing children from their parents without exigent circumstances, court order and/or consent of their parent or legal guardian, and without consideration of less restrictive methods." (County MSJ 10; Compl. ¶ 73(b).) A jury must determine whether or not a constitutional violation occurred before it may be determined whether the County's alleged policy was a moving force behind any constitutional violation.

### B. Sheila's Fourteenth Amendment Rights

Plaintiffs allege McCann and Huidor violated Sheila's Procedural and Substantive Due Process rights. (Pl. MSJ 24–25.) For this claim, courts apply the test as articulated in *Wallis*: "Parents and children have a well-elaborated constitutional right to live together without governmental interference." 202 F.3d at 1136. "The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies." *Mabe*, 237 F.3d at 1107. Officials violate this right if they remove a child from the home absent "information at the time of the seizure that establishes 'reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.'" *Id.* at 1106 (quoting *Wallis*, 202 F.3d at 1138).

The Court has analyzed the issue of exigency, *see supra* Section I.A. For the same reasons as articulated above, the Court **DENIES** Plaintiffs' Motion for Summary Judgment

---

[9] Defendants also assert the social workers are protected by qualified immunity. Because the Court has determined the issue of whether the social workers' beliefs and actions were reasonable involves disputed issues of material fact, the Court does not make a qualified immunity determination here. *See Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (finding it premature to decide the qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom") (internal citation omitted). *See also Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate.").

for Sheila's Fourteenth Amendment claim. Individual Defendants also moved for summary judgment on this claim, (Individuals MSJ 41–43), and because the Court finds a genuine issue of material fact exists, it **DENIES** Defendants' Motion as to this claim.

### *C. Sheila's Right to Make Decisions Regarding Cassandra's Treatment*

Plaintiffs allege McCann and Huidor violated Sheila's right to make important decisions about Cassandra's medical care and treatment by "concealing their investigation from Sheila and countermanding the decision for intensive therapeutic inpatient treatment at Project Oz." (Pl. MSJ 25.) The "right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Wallis*, 202 F.3d at 1141 (citing *Parham v. J.R.*, 442 U.S. 584, 602 (1979)). This is a right guaranteed under the Fourteenth Amendment. *Id.*

Such a right is not absolute: the "rights of children and parents to be free from arbitrary and undue governmental interference" must be balanced against "the legitimate role of the state in protecting children from abusive parents." *Id.* at 1130; *see also Greene v. Camreta*, 588 F.3d 1011, 1015–16 (9th Cir. 2009), *vacated in part on other grounds*, 563 U.S. 692 (2011) ("On one hand, society has a compelling interest in protecting its most vulnerable members from abuse within their home. . . . On the other hand, parents have an exceedingly strong interest in directing the upbringing of their children."). But as the Ninth Circuit has cautioned, "in the area of child abuse, as with the investigation and prosecution of all crimes, the state is constrained by the substantive and procedural guarantees of the Constitution." *Wallis*, 202 F.3d at 1130. Case law has not clearly established how these competing rights should be balanced.

Defendants argue Cassandra's placement at PCC was not a medical treatment decision but was "a decision made by social workers to protect a child in danger of being abused by her father at her home." (Def. Opp'n 16.) Defendants argue the social workers did not commit Cassandra to a psychiatric hospital or any facility but placed her in protective custody at emergency shelter. (*Id.*) Essentially, Defendants invite the Court to

view the incident in isolation. The Court declines to follow Defendants' reasoning and piecemeal the decision by CPS; certainly, placing a child at PCC alone is not a medical decision. Instead, the Court analyzes Cassandra's situation as a whole: the decision to remove Cassandra from the hospital and place her at PCC instead of transferring her to Project Oz. The issue is whether this series of events was a "medical decision" made by the social workers, and thus, whether Sheila's rights were violated.

Plaintiffs deposed Dr. Michael Juboori, a doctor at Sharp Mesa Vista. Dr. Juboori testified that the original plan was to send Cassandra to Project Oz. (ECF No. 154, at 8.) He testified it was CPS's "decision to take her to Polinsky, and . . . I can't say not to send her to this versus this. That's their decision and we agreed with it." (*Id.* at 10.) He testified that a decision to discharge a patient is a "team decision" but he is "the last one who will final discharge." (*Id.* at 11.) Cassandra's Psychiatric Discharge Summary states: "Initially, we thought the patient could go to Oz Program, but apparently CPS decided it would be best for the patient, according to their assessment, to be going to Polinsky Home, which they did." (ECF No. 154-1, at 4.) It goes on to state: "The patient has revealed allegation of sexual abuse by her father. As a result of that CPS intervened, and according to our knowledge, the patient was taken to Polinsky Home for further intervention by CPS." (*Id.* at 5; *see also id.* ("The patient was discharged to Child Protective Services.").)

On balance, the Court finds that Plaintiffs are not entitled to summary judgment on Sheila's Fourteenth Amendment claim. Plaintiffs have not met their burden in proving there is no disputed fact that a medical treatment decision was made for Cassandra by CPS, and, balanced against the state's interest in protecting children, this decision violated Sheila's constitutional rights. The Court finds the question of whether Sheila's rights were violated by this decision is more appropriate for a jury. The Court **DENIES** Plaintiffs' Motion for Summary Judgment as to this claim.

### D. Plaintiffs' Fourteenth Amendment Claim: Judicial Deception

Plaintiffs allege McCann violated their Fourteenth Amendment rights through McCann's judicial deception. (Pl. MSJ 27.) As background, a few days after the Garcia

children were placed at PCC, a hearing was held at the Juvenile Court. At this hearing, McCann submitted a Juvenile Dependency Petition, and the court ordered the children remain out of the home. Plaintiffs argue McCann lied in the petition. In this report, McCann declared under penalty of perjury that Rudy "sexually abused [Cassandra], including touching the child's breast and vaginal area under her clothes and taking a photograph of her bare chest." (ECF No. 125-36, at 50.)

To establish a claim of judicial deception under 42 U.S.C. § 1983, a plaintiff must "(1) establish that the . . . affidavit contained misrepresentations or omissions material to the finding of probable cause, and (2) make a 'substantial showing' that the misrepresentations or omissions were made intentionally or with reckless disregard for the truth." *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011) (citing *Ewing v. City of Stockton*, 588 F.3d 1218, 1223–24 (9th Cir. 2009)).

Defendants argue the statements were not false as evidenced by Bernaderet's report and Cassandra's statement to McCann. (Individual Def. MSJ 11; *see* ECF No. 125-42 (Suspected Child Abuse Report: "Dad came into the room and began to fondle [patient's] breasts, he groped her inner thigh, and took several nude pictures of her. [Patient] tearful and unable to say if this has happened previously or to her sisters.")). Defendants argue because Plaintiffs cannot show that McCann presented false information, Plaintiffs cannot win on summary judgment as to this claim.

Plaintiffs point out that certain statements in McCann's report are "not in any of the records in this case." (Pl. MSJ 27; Pl. Reply 11–12.) While it is true that the specific allegation that Rudy touched Cassandra's "vaginal area" and took photos of her "bare chest" are not in the report provided to McCann, the report did state that Rudy touched Cassandra's breasts, put his hand down her pants, and took pictures. A showing of a minor difference, or even exaggeration, between Bernaderet's report and McCann's report does not demonstrate that McCann deliberately or recklessly made misrepresentations to the court.

The Court finds that Defendants have presented a question of material fact as to

Plaintiffs' judicial deception claim against McCann. Based on the evidence available to McCann, there is a factual dispute as to whether the information she presented was deliberately or recklessly false. Having read the report by Bernaderet, McCann at least had a basis for making these statements in her report. Further, the Court cannot determine as a matter of law whether this information was material to the Juvenile Court in making its decision. The Court **DENIES** Plaintiffs' Motion for Summary Judgment as to this claim.[10]

### E. Physical Examinations

Plaintiffs allege the physical examinations of the Garcia children at PCC and the mental assessment of Cassandra by a County psychiatrist violated the Garcias' constitutional rights. (Pl. MSJ 36.) The Parties have provided PCC's Admission Physical Examination form, completed by PCC doctors for the Garcia sisters. Both Minors' evaluations indicate they were generally evaluated as to almost all parts of their body, (ECF No. 125-37, at 4; ECF No. 125-38, at 5). Cassandra was also evaluated physically and mentally. (ECF No. 125-39 at 1–11.)

Plaintiffs request the Court defer ruling on this issue until the Ninth Circuit issues an opinion in *Mann v. County of San Diego*, 147 F. Supp. 3d 1066 (S.D. Cal. 2015). Plaintiffs state the decision "will likely be dispositive of all of the issues in the present matter" related to examinations conducted at PCC. (ECF No. 165, at 2.) At oral argument,

---

[10] Further, the Court finds that McCann and Huidor are not entitled to absolute immunity for the judicial deception claim, as Defendants argue. "Social workers 'enjoy absolute, quasi-judicial immunity when making post-adjudication custody decisions pursuant to a valid court order.'" *Mabe*, 237 F.3d at 1109 (quoting *Babcock v. Tyler*, 884 F.2d 497, 503 (9th Cir. 1989)). The immunity "covers the official activities of social workers only when they perform quasi-prosecutorial or quasi-judicial functions in juvenile dependency court." *Hardwick*, 844 F.3d at 1115. Social workers may have absolute immunity when discharging functions that are "critical to the judicial process itself." *Beltran v. Santa Clara Cnty.*, 514 F.3d 906, 908 (9th Cir. 2008). "But they are not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury, because such actions aren't similar to discretionary decisions about whether to prosecute." *Id.* Because the Court finds above that there is a genuine issue of material fact as to whether McCann engaged in judicial deception, the Court similarly here finds that McCann (and Huidor, who signed the reports) are not entitled to absolute immunity.

Defendants stated they did not oppose this request.  The Court **DEFERS** ruling on this issue.  The Parties **SHALL** submit supplemental briefing on this issue <u>within ten (10) days of the Ninth Circuit issuing an opinion in *Mann.*</u>

### *F. Cassandra's Fourteenth Amendment Claim: Regarding Defendant Salcido*

Plaintiffs allege Salcido violated Cassandra's Fourteenth Amendment rights by failing to keep her safe.  (Pl. MSJ 28.)  Salcido was assigned as the social worker to Cassandra's case once she was ordered to be detained at PCC.  Plaintiffs state Salcido waited two weeks after the case was assigned to him to visit Cassandra at PCC.  (Pl. MSJ 28.)  When Cassandra went AWOL, Salcido "would have received notification" of this event, but he never notified the Garcias of the event.  (*Id.*)  When Cassandra was put in her grandmother's care, Salcido did not provide services to Cassandra and did not visit Cassandra when she was psychiatrically hospitalized four times in March 2013.  (*Id.* at 29.) He did not attempt to arrange placement for Cassandra at a therapeutic group home and did not check on her when she was placed back at PCC.  (*Id.*)  He did not visit her when she was hospitalized again and did not intervene when Cassandra continued to go AWOL.  (*Id.*) He also did not take any action until nine days after he found out about the rape.  (*Id.*) Plaintiffs argue this deliberate indifference violated Cassandra's Fourteenth Amendment right "to continued safety and security while in the County's care."  (*Id.*)

Defendants' argument against this claim is three-fold: (1) "Salcido has absolute immunity for following the Court's orders and advocating the Agency's positions"; (2) "Plaintiffs' allegations against him do not rise to the level of constitutional violations"; and (3) "he is entitled to qualified immunity if his acts and omissions did not violate Plaintiffs' clearly established rights."  (Def. Opp'n 20.)  The Court first addresses the underlying question of whether Salcido violated Plaintiffs' constitutional rights.

Defendants argue Plaintiffs are merely criticizing how Salcido did his job, and do not adequately allege constitutional violations.  (*Id.* at 21.)  As to Salcido's alleged failure to visit Cassandra and check on her, Defendants argue "Plaintiffs have no clearly established rights to be visited by a social worker within any period of time, checked on at

any particular time in their placements, or have their mental health issues discussed with professionals." (*Id.* at 22.) Defendants argue this does not constitute a Fourteenth Amendment violation. Similarly, Defendants argue Salcido's failure to notify Cassandra's parents about Cassandra going AWOL does not constitute a violation of the Fourteenth Amendment. (*Id.* at 23.) Further, Defendants argue Cassandra received therapy at PCC and there is no right to receive therapy or mental health care while in government care. (*Id.*) As to Cassandra's placement in a group home, Defendants state "Salcido sought and obtained a court order for her to be placed in a group home." (*Id.* at 23–24.) In sum, Defendants argue Salcido's conduct did not shock the conscience or rise to the level of deliberate indifference. (*Id.* at 24.)

"Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care . . . ." *Lipscomb By and Through DeFehr v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992). Cassandra was a ward of the state when she was ordered to be detained at PCC and was therefore owed this protection. She argues that her rights were violated by Salcido's failure to provide reasonable safety and care. To violate due process, state officials must act with such deliberate indifference to a person's liberty interest that their actions "shock the conscience." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (citation omitted). Conduct "shocks the conscience" when it is done with "deliberate indifference to a known, or so obvious as to imply knowledge of, danger." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1064 (9th Cir. 2006) (internal quotation marks omitted).

It appears that Salcido certainly could have done more for Cassandra as her assigned social worker. *See Tamas*, 630 F.3d at 843 (holding "the duty of guarding [a dependent's] safety . . . is the quintessential responsibility of the social workers assigned to safeguard the well-being of this helpless and vulnerable population"). But, there is no evidence that Cassandra was suffering at PCC, as she was receiving therapy there (although Plaintiffs argue it was minimal, (Pl. MSJ 16)). There is also no allegation that she was not receiving basic, adequate care, and, she was out of her parents' home, which is what the Court had

ordered. Further, Salcido declares he attended a meeting with the Garcia parents and several staff of the Health and Human Services Agency. ("Salcido Decl.," ECF No. 121-5, ¶ 6.) He states as a result of the meeting, the children were placed with their grandmother. He also states after he found out Cassandra had been placed in a psychiatric hospital due to being suicidal, he conducted a meeting with other Agency staff "to discuss a proper placement for Cassandra." (*Id.* ¶ 9.) He states that he arranged for Cassandra to be placed back at PCC after her release from the hospital, and stated he would ask at the court hearing on March 25, 2013 that Cassandra be placed in a higher level of care. (*Id.*) Before the hearing, he "prepared and submitted an Addendum Report to the juvenile court recommending that Cassandra be placed in a higher level of care, specifically a group home." (*Id.* ¶ 10.) The court agreed with the recommendation and ordered the higher level of care. (*Id.*)

Both Parties seem to agree on the actions Salcido took and did not take. However, after considering all of the evidence presented by both sides, the Court cannot find as a matter of law whether Salcido acted in a manner so intentional and offensive as to shock the conscience. Accordingly, Plaintiffs' request for summary judgment on their Fourteenth Amendment claim against Salcido is **DENIED**.[11]

### 1. Absolute Immunity for Defendant Salcido

The defense of absolute immunity is asserted regarding Plaintiffs' allegations that Salcido did not attempt to arrange placement for Cassandra at a group home.

"Social workers 'enjoy absolute, quasi-judicial immunity when making post-adjudication custody decisions pursuant to a valid court order.'" *Mabe*, 237 F.3d at 1109 (quoting *Babcock v. Tyler*, 884 F.2d 497, 503 (9th Cir. 1989)). The immunity "covers the official activities of social workers only when they perform quasi-prosecutorial or quasi-

---

[11] Defendants argue "[e]ven if any of Salcido's alleged acts or omissions rose to the level of a constitutional violation, he is still entitled to qualified immunity because the contours of Cassandra's rights were not clearly established under the specific circumstances of this case." (Def. Opp'n 24.) Because the issue of whether Salcido's conduct rose to the level of a constitutional violation is a question for the jury, an analysis of qualified immunity is premature. *See supra* footnote 9.

judicial functions in juvenile dependency court." *Hardwick v. Cnty. of Orange*, 844 F.3d 1112, 1115 (9th Cir. 2017). Social workers may have absolute immunity when discharging functions that are "critical to the judicial process itself." *Beltran v. Santa Clara Cnty.*, 514 F.3d 906, 908 (9th Cir. 2008). "[S]ocial workers are not afforded absolute immunity for their investigatory conduct, discretionary decisions or recommendations." *Tamas v. Dep't of Social & Health Servs.*, 630 F.3d 833, 842 (9th Cir. 2010). Examples of such discretionary decisions include "decisions and recommendations as to the particular home where a child is to go or as to the particular foster parents who are to provide care." *Miller v. Gammie*, 335 F.3d 889, 898 (9th Cir. 2003)

Defendants argue "Salcido has absolute immunity for his recommendations (or failure to make recommendations) in Court." (Def. Opp'n 21.) Defendants argue Salcido also has absolute immunity for following the Juvenile Court's order authorizing Cassandra's placement at PCC. (*Id.*). In reply, Plaintiffs argue the court's order was to detain Cassandra at "Polinsky Child Ctr., approved foster home, adjunct, <u>or</u> detained in a licensed group home." (Pl. Reply 14 (emphasis added) (citing ECF No. 125-36, at 62 (court order); ECF No. 153-19, at 2 (detention report).) Plaintiffs state Salcido therefore had the obligation to place Cassandra at an adequate placement. (*Id.*)[12]

The Court finds that Defendants have not proven that Salcido has absolute immunity for his actions. As alleged, Salcido engaged in discretionary decisions when he kept Cassandra at PCC and did not place Cassandra at a different facility. *See Miller*, 335 F.3d at 898 ("To the extent . . . that social workers also make discretionary decisions and recommendations that are not functionally similar to prosecutorial or judicial decisions, only qualified, not absolute, immunity, is available.") Because his actions were

---

[12] The court order also states: "The social worker is given the discretion to detain the minor with a relative or non-relative extended family with concurrence of minor's counsel." (ECF No. 125-36, at 62). Cassandra was transitioned into her grandmother's care, (Pl. MSJ 28), and Plaintiffs do not appear to allege Salcido failed to exercise this discretion in encouraging this. However, this language in the order bolsters the Court's finding that Salcido was given the authority to make discretionary decisions in the children's best interests.

discretionary, he is not entitled to absolute immunity.

### 2. *Fourteenth Amendment Claim: Regarding Defendants Palafox and Quintanilla*

Individual Defendants move for summary judgment on this claim of a Fourteenth Amendment violation for Salcido and his two supervisors, Palafox and Quintanilla. (Individuals MSJ 38.) Plaintiffs have alleged that these defendants should have more thoroughly reviewed Salcido's work before reviewing his forms. The Court finds that Plaintiffs have not alleged that these Defendants' conduct shocked the conscience. At most, Plaintiffs have alleged that these Defendants should have spent more time reviewing another social's work; this does not amount to deliberate indifference. The Court **GRANTS** Individual Defendants' Motion for Summary Judgment as to the Fourteenth Amendment claim against Palafox and Quintanilla.

### G. *State Law Claims*

Plaintiffs bring eight state-law claims: assault, battery, false imprisonment, intentional infliction of emotional distress, injunctive relief, and three violations of state statutes (Civil Code §§ 43, 51.7/52, and 52.1). Plaintiffs request summary judgment on only two of their state law claims: false imprisonment and claim pursuant to Civil Code § 43. The Court first addresses Defendants' argument that Plaintiffs have waived the ability to bring their state law claims because Plaintiffs untimely submitted their claims under the California Tort Claims Act.

California has sovereign immunity against tort claims for money damages, but the California Tort Claims Act ("CTCA") provides a limited waiver of this immunity. Under the CTCA, a plaintiff can bring tort claims against state and local public entities only if the plaintiff complies with the strict procedural requirements enumerated in the CTCA. *See* Cal. Gov. Code § 815. Among the procedural prerequisites for civil suit is the CTCA's requirement that a claimant file a written claim with the proper public entity. *See id.* §§ 905.2, 910, 911.2, 945.4. The claim must be presented to the relevant public entity no later than six months after the cause of action accrued. *Id.* § 911.2. If the claim is not presented

within that time, a written application may be made to the public entity for leave to present the late claim. *Id.* § 911.4. The application must be presented to the public entity "within a reasonable time not to exceed one year after the accrual of the cause of action and shall state the reason for the delay in presenting the claim." *Id.*

### 1. Accrual

Under California Government Code § 901,

> The date of the accrual of a cause of action to which a claim relates is the date upon which the cause of action would be deemed to have accrued within the meaning of the statute of limitations which would be applicable thereto if there were no requirement that a claim be presented to and be acted upon by the public entity before an action could be commenced thereon.

Here, Plaintiffs allege, for example, the children were falsely imprisoned when they were "taken from their parents' care and custody and interred at PCC." (Pl. MSJ 44; Compl. ¶ 51.) This cause of action would accrue on January 28 and 29, 2013, when the children were placed at PCC. Similarly, the other state law actions stem from the removal. (*See* Compl. ¶ 40 (assault claim); *id.* ¶ 45 (battery claim); *id.* ¶ 79 (intentional infliction of emotional distress claim); ¶ 85 (claim under Cal. Civil Code § 43); ¶ 94 (claim under Cal. Civil Code § 51.7 and § 52); and ¶ 102 (claim under Cal. Civil Code § 52.1). The claims presentation statute thus began when the children were removed on January 28 and 29, 2013. Plaintiffs submitted their claims to the agency on September 24, 2014. (Individuals MSJ 44.) Plaintiffs argue tolling makes their filing timely.

### 2. Tolling

Plaintiffs make two arguments why the statute should be tolled. First, Plaintiffs state September 24, 2014 is "within six months of when the County stopped its investigation of Plaintiffs." (Pl. Opp'n to Individ. 46.) Plaintiffs state that while Defendants first contacted Plaintiffs in January 2013, they "continued their investigation" through March 26, 2014, and the claims presentation statute should be tolled through this time. (*Id.* (citing *Ortega v. Pajaro Valley Unified Sch. Dist.*, 64 Cal. App. 4th 1023, 1047 (Ct. App. 1998)).)

As mentioned above, the CTCA provides a strict timeline in which a plaintiff must

26

file his claims. But, the claims presentation statute is tolled during the periods when the public entity's affirmative acts deter the filing of a claim. *John R. v. Oakland Unified Sch. Dist.*, 769 P.2d 948, 951 (Cal. 1989). This case does not say the statute is tolled while County employees are continuing to investigate the allegations. Plaintiffs have not pointed to any authority, nor can the Court locate any, that states the statute is tolled during a standard investigation. Plaintiffs' argument that "[t]he County's continuing investigation and constant contact with the Garcia family through March 26, 2014 was an absolute deterrent" to their filing of the claims is without support and unavailing. *See Ortega*, 64 Cal. App. 4th at 1045 ("Claims of estoppel have been rejected . . . where the plaintiff cannot show calculated conduct or representations by the public entity or its agents that induced the plaintiff to remain inactive and not to comply with the claims-presentation requirements."). The statute is not tolled for this reason.

Second, Plaintiffs cite to California Government Code § 911.4. The claims presentation statute is tolled when a person "is detained or adjudged to be a dependent child of the juvenile court" if: "[t]he person is in the custody and control of an agency of the public entity to which a claim is to be presented." § 911.4(c)(2). Further, the statute is tolled "during which a minor is adjudged to be a dependent child of the juvenile court" and "the minor is without a guardian ad litem or conservator for purposes of filing civil actions." § 911.4(c)(3).

Here, Defendants concede that the claims presentation statute was tolled from March 25, 2013 (when the children were adjudged dependents of the juvenile court) to March 26, 2014 (when jurisdiction was terminated). (Individuals Reply 18); *see Cnty. of Los Angeles v. Superior Court*, 91 Cal. App. 4th, 1303, 1310 (Ct. App. 2001) (holding the parents of the minors "had no legal right to custody and control of Minors until the dependency case ended"). But, the statute ran from January 28, 2013 (the date of removal) to March 25, 2013, i.e., 56 days. The children were not adjudged dependents during this time. It then ran from March 25, 2014 to September 24, 2014 (when the Garcias filed their claim), i.e.,

almost six months. Defendants argue Plaintiffs must have filed their claims on July 28, 2014 for them to be timely.

There is no provision that the claims presentation statute is tolled when minors are not in the physical custody of their parents, but have not yet been adjudged dependents of the court (here, the time from January 28 to March 25, 2013). Thus, this time counts towards the six-month requirement. Because, in totality and even considering tolling, Plaintiffs did not file their claims within six months of accrual, their state law claims are untimely. While the Court appreciates the argument that cases should be decided on the merits rather than on procedural grounds, (Pl. Opp'n to Individ. 47), Plaintiffs have failed to comply with strict, technical requirements of California law. The Court **GRANTS** Defendants' Motion for Summary Judgment regarding Plaintiffs' state law claims.

## II. *Monell* Claims (Plaintiffs' and the County's MSJs)

Plaintiffs request summary judgment on their *Monell* claims against the County. (Pl. MSJ 30); *see Monell v. N.Y.C. Dep't. of Social Servs.*, 436 U.S. 658 (1978). The County likewise requests summary judgment on the claims. (County MSJ.) The Court will address Plaintiffs' Motion first. Plaintiffs claim liability against the County under two methods: first by arguing that the County had policies that violated Plaintiffs' constitutional rights and second by arguing that the County engaged in deficient supervision and training. (Pl. MSJ 30.)

### A. Legal Standard

To establish municipal liability under § 1983 for violation of constitutional rights, the plaintiffs must show that (1) they were deprived of a constitutional right; (2) the County had a policy; (3) the policy amounted to a deliberate indifference to the constitutional right; and (4) the policy was the "moving force behind the constitutional violation." *Mabe*, 237 F.3d at 1110–11 (citing *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996)). In regards to the second element,

> [T]here are three ways to show a policy or custom of a municipality: (1) by showing "a longstanding practice or custom which constitutes the standard

operating procedure of the local government entity"; (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision"; or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate."

*Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 964 (9th Cir. 2008) (quoting *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002)).

### B. Plaintiffs' First *Monell* Theory: Unlawful Policies

Plaintiffs argue the County has various policies that were moving forces behind the violations of Plaintiffs' constitutional rights by Defendant social workers.

#### 1. Warrant Process

Plaintiffs argue the County's warrant process ensures constitutional violations. Plaintiffs state "every social worker, supervising social worker, social worker trainee, and person most knowledgeable for the County who was asked testified that it takes, at a minimum, *2 full business days* to obtain a protective custody warrant . . . because they are required, *due to County policy*, to conduct a full investigation and prepare a Detention Report rather than simply submit a Petition." (Pl. MSJ 31–32.)  Plaintiffs also state various witnesses have testified that no warrants are issued on the weekends or after hours.  (Pl. Reply to County 14 (citing e.g., "Huidor Depo," ECF No. 125-6, at 15).)  Plaintiffs argue "the County's warrant process was a moving force behind the constitutional violations" of removing the Garcia children without exigency.  (Pl. MSJ 33.)

The Court finds there is a genuine issue of material fact as to whether the County's warrant process was a moving force behind Plaintiffs' alleged constitutional violations. McCann states she removed the children because, in part, she believed that the "parents might get drunk again, and that Mr. Garcia might abuse one or more of the children in the 48–72 hours it would typically take to get a warrant."  (Def. Opp'n 13.)  This time limit is a factor in the reasonableness of McCann's decision, *see supra* Section I.A.  The Court **DENIES** both Plaintiffs' and Defendant's Motions for Summary Judgment as to this claim.

### 2. *Discharge Policy*

Plaintiffs argue the County had no practices surrounding discharges of children from hospitals to PCC. (Pl. MSJ 33.) Plaintiffs agree the County had a "'policy' to address the needs of such children," but the social workers disregarded it and never used it. (*Id.* at 34.) Plaintiffs argue the "failure to implement such practices" violates the County's duty to safeguard the well-being of children. (*Id.*) Plaintiffs state the County's lack of implementation for these policies was a moving force behind the violation of Cassandra's Fourth Amendment right and Sheila's Fourteenth Amendment right, as addressed above. (Pl. Reply 10–11.) The Court finds, *supra* Section I.A.2., that there is a question of material fact as to whether a violation occurred when Cassandra was discharged and taken to PCC. The Court **DENIES** Plaintiffs' Motions for Summary Judgment as to this claim.

### 3. *Failure to Notify Parents*

Plaintiffs' allege that the County had a policy, practice, or custom of "[f]ailing to notify, discuss, consult, and obtain the consent of, parents when making medical and/or mental health decisions regarding their minor child, including during removals from hospitalizations." (Compl. ¶ 73(k).) The County argues that the policy in fact provided that "when a child is evaluated for potential hospitalization or is hospitalized, the assigned social worker should immediately notify the child's parents." (County MSJ 30.)

Even if a jury determines that CPS failed to notify Sheila when making a medical decision for Cassandra*, see supra* Section I.C., Plaintiffs have not alleged that there was a County policy in this regard. In fact, Plaintiffs allege the Individual Defendants "deliberately chose" to disregard the County's Psychiatric Discharge policy. (Pl. Reply to County 28.) This is not evidence of a policy that was a moving force behind an alleged violation. The Court **GRANTS** the County's MSJ for this claim.

### 4. *PCC Policies (Re: Exposure to Danger and Adequate Therapy)*

Plaintiffs argue the County had a duty to provide Cassandra with reasonable safety and care once she was removed from her parents' custody. (Pl. MSJ 34.) Plaintiffs argue as a result of the County's failure to do so, Cassandra was exposed to danger, and was not

provided with adequate therapeutic support.  (*Id.* at 34–36.)  In support, Plaintiffs cite to *Tamas*, wherein the Ninth Circuit held

> [t]he Fourteenth Amendment substantive due process clause protects a foster child's liberty interest in social worker supervision and protection from harm inflicted by a foster parent.  Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care.

630 F.3d at 842 (citing *Lipscomb*, 962 F.2d at 1379).  Defendants argue that there is no authority that placement in an emergency shelter, like Cassandra was, violates the child's constitutional rights.  (Def. Opp'n 34–35.)  Defendants argue Cassandra had no constitutional right to a certain type of therapy, to placement in a certain room, or to a "higher level of care."  (*Id.* at 35 (citing Pl. MSJ 35).)

The Court agrees that Cassandra was owed reasonable and adequate care, but the Court finds that Plaintiffs have not demonstrated that a constitutional right has indisputably been violated.  The Court finds there is an issue of material fact as to whether Cassandra was provided with reasonable and adequate care while at PCC, and to what that care would entail.  The Court **DENIES** both Plaintiffs' and Defendant's Motion as to this issue.

### 5. The County's AWOL Practices

Plaintiffs state the County has deficient policies on how to handle AWOL events and allows children to leave PCC and put themselves at risk of harm.  (Pl. MSJ 37.)  Plaintiffs state PCC's

> AWOL protocol (Notice #35) and a longstanding practice that mandates that only the child's assigned social worker, a County employee *outside of the walls of PCC and mostly unavailable and unaware that a child may be about to AWOL* can order a PCC worker to put his or her hands on an AWOLing child.  Neither is effective to prevent a child who wishes to AWOL from leaving the facility.

(*Id.* at 38 (citations omitted) (citing ECF No. 126-1, at 45–49) (Notice #35).)  Plaintiffs also state that the Protocol does not require PCC to notify the minor's parents of the AWOL event, (*id.* at 39–40), and only involves notification of the minor's social worker which is usually done through email, (*id.* at 39).

According to a Notice to PCC staff issued by PCC, it is acknowledged that "it is difficult to prevent a minor from running away from an unlocked facility like PCC." (ECF No. 126-1, at 45.) Staff may "position themselves to block the youth's AWOL exit route," "may use verbal direction to re-direct the youth. Physical restraining behavior should not be used." And, "staff may surround the minor in a non-threatening manner and walk the youth to a safe place to be counseled." (*Id.* at 46.) If this is not effective, staff contacts the Duty Officer who "will exercise professional judgment to decide if a standing restraint can be used to prevent the youth from AWOL." (*Id.* at 47.) In some situations, when the child exhibits "Extraordinary AWOL behavior," PCC staff may physically stop the child from leaving the facility. (*Id.* at 45.) If the minor is exhibiting, among other things, extreme agitated behavior or "concrete suicidal/homicidal ideation or behavior," then that minor may be restrained.

The first issue is what constitutional right is alleged to be violated by PCC's policies. Plaintiffs state it is the "right to be safe and protected in the County's custody." (Pl. Reply 17.) "Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." *Lipscomb*, 962 F.3d at 1379. Plaintiffs allege Cassandra's right to safety and care was violated due to PCC's AWOL policy.

Defendant cites to *Wilson v. County of San Diego*, 91 Cal. App. 4th 974, 977–78 (Ct. App. 2001), where a California Court of Appeal held that the County of San Diego "and its employees did not have a mandatory duty to prevent an adolescent from running away from Polinsky Children's Center (Polinsky), where he was placed after being taken into protective custody." Defendants cite to Community Care Licensing restrictions which "prohibit the County from locking all of the doors at Polinsky" and to California Welfare and Institutions Code § 206 which "requires dependent children to be placed in a 'nonsecure' facility." (Def. Opp'n 39.)

Defendant has convincingly argued that it has no duty nor legal obligation to lock

the children inside PCC. But, the issue is whether the policies at PCC violated Cassandra's right to be provided with reasonable safety, in other words, are PCC's policies sufficient to provide the constitutional level of care? Even if PCC could not physically lock the doors, could the policies be more protective? Although a minor like Cassandra may not have been exhibiting "concrete suicidal" behavior at the moment she went AWOL, should PCC policies allow staff to physically restrain a minor based on her past behavior? The Court finds that a genuine issue of material fact exists as to this issue, and a jury is to determine whether PCC policies regarding AWOL provided Cassandra with reasonable care and safety.

Because the Court determines there are genuine issues of material fact, the Court **DENIES** both Plaintiffs' and Defendant's Motions for Summary Judgment as to this claim. Along the same vein, because a genuine issue of material fact exists as to the issue of the County's failure to keep children safe at PCC, the Court **DENIES** the County's Motion for Summary Judgment as to Plaintiff's allegation that in the County had a policy, practice, or custom of "[f]ailing to properly supervise and care for children while within the custody of COUNTY, and informing parents of their child's condition and situation, including while at PCC." (County MSJ 31; Compl. ¶ 73(l).)

### C. *Plaintiffs' Second* **Monell** *Theory: Inadequate Training and Supervision of Employees*

A plaintiff can establish § 1983 liability against a municipality by showing the failure to train its employees, but only "where the failure to train amounts to deliberate indifference to the rights of persons with whom the [employee] come into contact." *City of Canton*, 489 U.S. at 388. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* The plaintiff "must demonstrate a 'conscious' or 'deliberate' choice on the part of a municipality in order to prevail on a failure to train claim." *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008).

Plaintiffs attack various allegedly deficient training programs in this regard: (1) the County's failure to ensure its social workers receive mandatory training on exigency; (2) the County's failure to train on its psychiatric policies; and (3) the County's insufficient training on safety at PCC. (Pl. MSJ 41–44.)

### 1. Exigency Training

Plaintiffs state that the County has implemented trainings for its social workers that train them on exigency as it relates to the removal of children from the custody of their parents. (Pl. MSJ 41.) But, Plaintiffs state that although these trainings are deemed "mandatory," neither Huidor nor McCann attended refresher training courses prior to the removal of the Garcia children. (*Id.*) Plaintiffs state that this shows the County is deliberately indifferent as to whether its social workers participate in these trainings and there is no method in place to ensure that the social workers participate in the training. (*Id.*)

Defendants argue that evidence that two employees failing to attend a class is insufficient to establish a deliberately indifferent policy. (Def. Opp'n 41.) Defendants also argue that the there is no evidence the County was on notice that any omission violated citizens' constitutional rights. (*Id.* at 42 (citing *Board of Cnty. Com'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997)).) In reply, Plaintiffs respond that the County has been considering implementing a tracking mechanism to determine whether or not a social worker is receiving the necessary training for the past ten years, but has not yet implemented such a system. (Pl. Reply to County 32 (citing Deposition of County's Person Most Knowledgeable Elyce Hoene).) Plaintiffs allege this longstanding failure amounts to a deliberate choice on behalf of the County.

The Court finds there is a genuine issue of material fact as to whether there was a failure by the County to train its employees on this issue, whether this alleged failure amounted to deliberate indifference. The Court finds that summary judgment is not warranted on this issue, and Plaintiffs' and the County's Motions for Summary Judgment as to this issue are **DENIED**.

/ / /

### 2. *Psychiatric Policy Training*

Plaintiffs allege that McCann and Huidor "had no training on any of the County's psychiatric policies [and] they did not comply with the County's Psychiatric Hospital Discharge policy when assessing Cassandra and transferring her to PCC." (Pl. MSJ 42.) Plaintiffs also allege Salcido had no training on the County's psychiatric policies because he did not "visit [Cassandra] in the hospital within one working day of admission, on only one occasion did he attend a treatment team meeting, and he did not plan for an appropriate placement using a Team Decision-Making Meeting, as required by the County's Psychiatric Hospitalization policy." (*Id.* (citing ECF No. 126-1, at 2–9 (psychiatric policies)).) Plaintiffs say this failure was a moving force behind the violation of "Cassandra's wrongful removal, in violation of her Fourth and Sheila's Fourteenth Amendment rights, and Salcido and the County's failure to protect Cassandra's well-being while she was in the County's custody, in violation of her Fourteenth Amendment rights." (*Id.* at 43.)

Defendants argue Plaintiffs have not shown that their rights were violated or that any violation was caused by the County's failure to train its workers on the policies. (Def. Opp'n 43.) Defendants argue that Plaintiffs' allegations, that the social workers did not comply with set policies, does not constitute a constitutional violation. (*Id.* at 44.)

Plaintiffs have failed to allege a lack of training on behalf of the County simply because three people in this case allegedly did not comply with the County's policies. There is no evidence the County exerted any "deliberate indifference" to the need for more or better training for its psychiatric policies. The Court **GRANTS** the County's MSJ for this claim.

### 3. *Safety at PCC Training*

Plaintiff argues there is deficient training at PCC that was a moving force behind violations of the County's duty to protect Cassandra's well-being while she was in its custody. (Pl. MSJ 44.) Plaintiffs have taken the depositions of various PCC employees, and Plaintiffs say the depositions show "PCC employees do not fully understand what it is

they are supposed to be doing." (*Id.* at 43.)

In response, Defendant argues the County conducts training with Polinsky staff on County and PCC policies and procedures, and on the procedures regarding interacting with children at PCC and preventing AWOL incidents. (Def. Opp'n 45.) Defendants argue PCC staff discuss the policies during staff meetings, and attend biannual refresher courses.

The problem here is that Plaintiffs disagree with PCC's policies on children who AWOL; not that PCC does not train its staff on its policies. Even if every employee had followed PCC's policies while Cassandra was AWOLing (the Court does not opine on this one way or the other), Plaintiffs still would allege, and are alleging, that Cassandra's rights have been violated because she was not stopped from leaving PCC. There is no evidence that PCC failed to train its employees on its policies, nor of a "conscious" or "deliberate" choice on the party of the County in failing to train. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007). The Court **GRANTS** the County's MSJ as to this claim.

### D. Policy Regarding School Interviews

Plaintiffs allege that in 2013, the County had a policy, practice, or custom of "[i]nterviewing MINORS without their parents' knowledge, consent, and presence, without Court order and without justification." (Compl. ¶ 73(j).) The first issue is whether CNG and Cassandra's constitutional rights were violated when McCann interviewed them (CNG at school and Cassandra at the hospital). Plaintiffs have conceded that McCann is protected by qualified immunity for her seizures and interviews of Cassandra and CNG. (Pl. Opp'n to Individ. 35.) But, Plaintiffs note "this Court must rule on the constitutionality of McCann's conduct for the purposes of Plaintiffs' *Monell* claim against the County of San Diego concerning in-school interviews of suspected victims of child abuse." (*Id.*)

#### 1. Constitutionality of the Seizures

To succeed on their Fourth Amendment claim, Plaintiffs must show that a seizure occurred and that the seizure was unreasonable. A seizure occurs when, in light of all the circumstances, a reasonable person would have believed that he or she was not free to leave. *Jones v. Cnty. of Los Angeles*, 802 F.3d 990, 1000–01 (9th Cir. 2015) (citing *United*

*States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "The Ninth Circuit has identified five factors that aid in determining whether a person's liberty has been so restrained." *United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009). Those factors are "(1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's authoritative manner would imply that compliance would be compelled; and (4) whether the officers advised the detainee of his right to terminate the encounter." *Id.*

As another court in this district has held: "These factors do not fit neatly into the context of a child interviewed by a social worker during a child abuse investigation. Because whether a seizure occurs depends on the totality of circumstances, the Court also considers [the child's] age, education, mental development, and familiarity with the interview process." *Dees v. Cnty. of San Diego*, No. 14-cv-189-BEN-DHB, 2017 WL 4511003, at *6 (S.D. Cal. Oct. 10, 2017). The Court concurs and adopts those factors here.

a. Interview of CNG

On January 28, 2013, McCann went to CNG's school, Thurgood Marshall Elementary School, and asked the staff to allow her to interview CNG. (McCann Decl. ¶ 12.) CNG was 10 years old. She met with McCann alone with no one else present. McCann states she told CNG she could have someone else present with her, but CNG declined (*Id.*) McCann told CNG she could leave at any time, (*id.*), but Plaintiffs state CNG was never told she did not have to meet with McCann in the first place, (Pl. Reply 32). Indeed, CNG states she was given a note that said "Go to the principal's office" and she left class and met McCann. ("CNG Depo.," ECF No. 127, at 63). CNG remembers McCann being nice and not rude. (*Id.* at 64.) McCann states the interview lasted fifteen minutes; CNG believes it lasted longer than this but does not remember. (*Id.*)

Naturally, Plaintiffs cite to *Dees*, where Judge Benitez found that McCann seized another minor child when she interviewed her at school. 2017 WL 4511003, at *6 ("A reasonable nine-year-old child who is called out of class by school officials for the purpose of meeting with a social worker who has already disturbed the child's family life, and who

is not advised that she may refuse to speak with the social worker, will feel compelled to talk to the social worker and remain there until dismissed.").

Here, unlike in *Dees*, CNG had never met McCann previously nor is there any indication she had any experience with social workers. But, similar to *Dees*, there is evidence that CNG felt compelled to speak with McCann; she was "pulled out of class," McCann told her "I'm going to ask you a few questions," and she does not remember McCann telling her she could stop talking to her at any time. (CNG Depo. 63–64.) The Court finds that a seizure occurred; a reasonable child in CNG's position would have believed that she was not free to leave. *Jones*, 802 F.3d at 1000–01. But, the seizure must have been unreasonable for CNG's Fourth Amendment right to have been violated.

As Judge Benitez noted, "[n]either the Supreme Court nor the Ninth Circuit has decided what reasonableness standard applies to seizures of children at school during child abuse investigations." *Dees*, 2017 WL 4511003, at \*7. After analyzing relevant authority, Judge Benitez concluded "McCann needed a warrant, court order, parental consent, exigency, or at the very least, reasonable suspicion to seize and interview [the minor]." *Id.*; *see Greene*, 588 F.3d at 1027 (holding the seizure of a nine-year-old child "in the absence of a warrant, a court order, exigent circumstances, or parental consent was unconstitutional"). In this case, there was no warrant, court order, or parental consent for McCann to interview CNG. But, in contrast to *Dees*, here, McCann had reasonable suspicion that CNG was the subject of child abuse or sexual misconduct. *See Terry v. Ohio*, 392 U.S. 1, 19–27 (1968) (holding that an officer's reasonable suspicion of criminal activity may justify a brief investigatory detention); *Dees*, 2017 WL 2017 WL 4511003, at \*7 n.2 (the court "assume[d], without deciding, that a seizure could be reasonable if the social worker had reasonable suspicion that the child was the victim of child abuse and neglect"). The Court finds that such a suspicion should be taken into consideration when determining the reasonableness of a seizure. McCann had met with Cassandra who allegedly disclosed to McCann the incident with Rudy, and McCann had been informed that Cassandra began "sobbing hysterically" when asked if Rudy had touched her sisters

inappropriately. (McCann Decl. ¶ 11.) It is reasonable to infer that CNG may have been subjected to inappropriate touching, like McCann believed Cassandra had been. Therefore, because of this reasonable suspicion, the Court finds McCann did not violate CNG's Fourth Amendment rights by briefly interviewing CNG at school.[13]

### b. Interview of Cassandra

On January 28, 2013 McCann interviewed Cassandra while in the hospital, while accompanied by Detective Heizmann. The Court again finds a seizure occurred; not only was McCann conducting the interview, but a police detective was present as well. Further, it is clear Cassandra was emotionally vulnerable and in a troubled state at the time, separated from her family, and had recently threatened to commit suicide. It would be reasonable to assume she did not feel free to end the interview. However, the Court finds it was not an unreasonable seizure, for the same reasons articulated above as to CNG. McCann had a reasonable suspicion, through a documented report submitted by a hospital social worker, that Cassandra was a victim of sexual abuse. Therefore, the Court finds McCann did not violate Cassandra's Fourth Amendment rights by interviewing Cassandra at the hospital.

The Court **GRANTS** Individual Defendants' Motion for Summary Judgment as it relates to Plaintiff's claim of violation of Cassandra and CNG's Fourth Amendment rights due to unreasonable seizures. Because the Court finds no constitutional violation, the Court likewise **GRANTS** the County's Motion for Summary Judgment as it relates to Plaintiffs' allegation that the County had a policy of conducting unlawful school interviews. (County MSJ 28.)

### E. The Remainder of the County's MSJ

The majority of the issues in the County's MSJ have been addressed above, but the

---

[13] This finding does not contradict the Court's earlier finding regarding exigency. Here, the Court finds it was reasonable for McCann to think the Garcia children may have been subjected to sexual misconduct by their parent. This does not mean that the Court finds it was reasonable for McCann to remove the children without a warrant; this issue still presents a genuine issue of material fact.

Court addresses any allegations identified by the County in its Motion.

### 1. *Coercive/Intimidating Conduct*

The County moves for summary judgment as to Plaintiffs' allegation that in 2013, the County had a policy, practice, or custom of "[u]sing coercive, intimidating, abusive, demeaning, and improper conduct during their investigation of Plaintiffs, including using the threat of removal of the MINORS when no basis for removal was present." (County MSJ 9; Compl. ¶ 73(a).) Plaintiffs no longer assert this claim. (Pl. Opp'n to County 6.) The Court **GRANTS** Defendant's MSJ as to this claim.

### 2. *Evidence Fabrication*

The County moves for summary judgment as to Plaintiffs' allegation that in 2013, the County had a policy, practice, or custom of "[f]abricating, or failing to provide exculpatory evidence, in report requests for court orders with the intent of violating the rights of the Plaintiffs." (County MSJ 11; Compl. ¶ 73(c).) The Court analyzes this with two similar allegations, of which the County also moves for summary judgment. The County moves for summary judgment as to Plaintiffs' allegation that in 2013, the County had a policy, practice, or custom of "[u]sing trickery, duress, fabrication and/or false testimony or evidence, and in failing to provide exculpatory evidence in preparing and presenting reports and court documents to the Court." (County MSJ 13; Compl. ¶ 73(e).) Finally, the County also moves for summary judgment as to Plaintiffs' allegation that in 2013, the County had a policy, practice, or custom of "[s]igning and presenting petitions in dependency actions under the penalty of perjury without personal knowledge of the truth and/or accuracy of the allegations contained therein." (County MSJ 13; Compl. ¶ 73(g).) In response, Plaintiffs state that when the County's Person Most Knowledgeable ("PMK") Elyce Hoene was asked to identify a policy that social workers must be honest and submit accurate reports, she "thought" that the issue was covered by the code of ethics. (Pl. Opp'n to County 28.) Plaintiffs state this is proof there is no policy regarding honesty and against fabrication. In reply, the County cites to the Social Worker Code of Ethics, which states the County strives to "help SWs [Social Workers] maintain high standards of personal

conduct in the capacity or identity of social worker," and that Workers shall "[n]ot engage in any action that would violate or diminish the civil or legal rights of clients." (County Reply 15.)

The Court finds that there is no genuine issue of material fact that there is no policy that was a moving force behind the alleged violation of Plaintiffs' rights. Even if McCann did fabricate evidence, and even if the County's PMK could not point to a policy that encourages honesty, this does not mean the opposite is true, namely that there is a policy that encourages fabrication. Plaintiffs have presented no question of material fact as to whether the County has a policy of custom that encourages dishonesty. The Court finds there is no policy that would create municipal liability for the County. The Court **GRANTS** the County's MSJ as to these three claims, (Compl. ¶ 73(c), (e), and (h)).

### 3. Removal from Custody

The County moves for summary judgment as to Plaintiffs' allegation that in 2013, the County had a policy, practice, or custom of "[c]ausing minor children to be dependents of the County, and continuing to be dependents; thus removing their legal and physical custody from their parents beyond a reasonable period after the basis for such removal is negated." (County MSJ 12; Compl. ¶ 73(d).) Plaintiffs no longer assert this claim. (Pl. Opp'n to County 6.) The Court **GRANTS** the County's MSJ as to this claim.

### 4. Intimidation

The County moves for summary judgment as to Plaintiffs' allegation that in 2013, the County had a policy, practice, or custom of "[u]sing intimidation, fear, threats, coercion, retaliation, misrepresentation and duress during their investigation of allegations of child abuse and/or neglect, and during the pendency of dependency proceedings." (County MSJ 14; Compl. ¶ 73(h).) Plaintiffs no longer assert this claim. (Pl. Opp'n to County 6.) The Court **GRANTS** the County's MSJ as to this claim.

### 5. Discipline of Employees

The County moves for summary judgment as to Plaintiffs' allegation that the County has acted with deliberate indifference in "failing to correct the wrongful conduct of other

41

employees" who perform actions related to child welfare services. (County MSJ 34; Compl. ¶ 73(n).)

Plaintiffs argue that Huidor, Palafox and Quintanilla, as supervisors, "adopted a uniform disregard of the known and/or obvious consequences of the actions of their social workers." (Pl. Opp'n to County 33.) Plaintiffs state that none of the Defendants were counseled or disciplined in any way for their actions related to this matter. (*Id.* at 34 (citing to deposition of Michelle Deitrich, the County's PMK concerning discipline).)

In response, Defendants argue that Plaintiffs have not proven a violation under the ratification theory, which requires them to show the "authorized policymakers approve[d] a subordinate's decision and the basis for it." *Christie v. Iopa*, 176 F.3d 1231, 1238–39 (9th Cir. 1999). Ratification requires, "among other things, knowledge of the alleged constitutional violation." *Id.* "Neither a policymaker's mere knowledge of, nor the policymaker's mere refusal to overrule or discipline, a subordinate's unconstitutional act suffices to show ratification." *Rabinovitz v. City of Los Angeles*, 287 F. Supp. 3d 933, 967–68 (C.D. Cal. 2018) (citing *Christie*, 176 F.3d at 1239). (County Reply 19.)

Plaintiffs have presented no evidence that the supervisors knew of the basis for the alleged constitutional violations and authorized the decisions. Even if Plaintiffs prove the underlying constitutional violations, Plaintiffs have only alleged the supervisors had knowledge of the violations but did not overrule or discipline the social workers. (*See* Pl. Opp'n to Individ. 34–35.) This is insufficient to show ratification. The Court **GRANTS** the County's MSJ as to this claim.

## III. Individual Defendants' MSJ

The majority of the issues in the Individual Defendants' MSJ are covered above. The Court addresses the remaining issues.

### A. Defendant Walsh

Defendant Srisuda Walsh works for CPS and approved the Risk and Safety Assessment forms completed by McCann on January 30, 2013. (Pl. Opp'n to Individ. 23.) Defendants argue Defendant Walsh was not actively involved in this case: "She was not

in the office on the day of the removal, made no decisions regarding the removal, did not review or approve any court reports, and was not involved after the dependency case began. Her only possible involvement was to approve two forms that McCann filled out." (Individuals MSJ 29.) Plaintiffs do not appear to contest that this was Walsh's only involvement in this case and only refer to Walsh's approval of the forms in their response. (Pl. Opp'n to Individ. 23–24.)

Plaintiffs respond by pointing to the alleged inaccuracies in the forms McCann filled out, and stating Walsh "simply approved" the forms rather than question McCann. (*Id.* at 24.) Plaintiffs state the forms were rubber-stamped by Walsh who "ignored her duties and responsibilities and allowed McCann to do whatever she pleased without supervision or oversight." (*Id.*) Plaintiffs cite to *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004), where the Ninth Circuit held that a group of individuals can be liable if each is an "integral participant" in the violation. There, although one officer deployed a flash-bang (which was a Fourth Amendment violation), the other officers "participated in some meaningful way" because they were aware of the decision to use the flash-bang, did not object to it, and "participated in the search operation knowing the flash-bang was to be deployed." *Id.*

*Boyd* was distinguished by another district court in *Monteilh v. County of Los Angeles*, 820 F. Supp. 2d 1081, 1090 (C.D. Cal. 2011). There, similar to the present case, a child was removed from his home by a social worker in alleged violation of his constitutional rights. The issue was whether the officers that were present could be held liable for the violation. The officers "stood outside Plaintiff's home, behind the social workers, armed, and in full uniform" but the court held that their presence "is insufficient to establish integral participation if the Officers have no knowledge of or reason to know of an unlawful act." *Id.* The officers were never given a reason to believe that the social workers did not have authority to remove the child and no reason to believe there were no exigent circumstances.

Here, Walsh was not present at the removal and her only involvement was reviewing

forms filled out by McCann. This case can therefore be distinguished from *Boyd* where the officers acted as a team and carried out a preplanned search operation. 374 F.3d at 777. Before the search, the officers "gathered for a briefing" and "discussed various circumstances surrounding the operation." *Id.* Only after this collective discussion did the supervising sergeant make the ultimate decision to use a flash-bang device. *Id.* In contrast, no facts in this case suggest that Walsh was privy to any discussions, briefings, or collective decisions made by the other social workers. Even assuming all of Plaintiffs' allegations were true (i.e., that McCann filled out the forms inaccurately and removed the children without exigency, (*see* Pl. Opp'n to Individ. 23)), Walsh had no reason to know that this was so and had no knowledge of the circumstances before McCann made the decision. Approving a form does not make someone an integral participant. The Court **GRANTS** Defendants' Motion for Summary Judgment regarding Plaintiffs' claims against Defendant Walsh. Defendant Walsh is no longer a part of this case.

## B. Judicial Deception

Plaintiffs argue "[h]ad Salcido, Palafox and Quintanilla complied with their duty and obligation to investigate and corroborate the allegations made by McCann and Huidor, they 'would have known [these statements] were false had [they] not recklessly disregarded the truth.'" (Pl. Opp'n to Individ. 39 (quoting *Hardwick v. Cnty. of Orange*, 844 F.3d 1112, 1118 (9th Cir. 2017)).) Plaintiffs state these three Defendants "continued to report the falsehoods included in McCann and Huidor's Petitions and Detention Report, specifically repeating, verbatim, the totally false statements made by McCann in the Petitions." (*Id.* at 38.) There is no allegation that these three Defendants made any false statements or omissions; the only allegation is that they should have been better supervisors and/or investigators of McCann's statements. There is no allegation that they "repeated" falsehoods from McCann intentionally. This is insufficient to establish judicial deception. The Court **GRANTS** Defendants' Motion for Summary Judgment as to judicial deception as to Salcido, Palafox, and Quintanilla. This removes Defendants Palafox and Quintanilla from the case.

### C. Waiver

Defendants argue Plaintiffs waived challenges to Defendants' post-removal conduct by not objecting in state court. (Individuals MSJ 37.) In January 2013, a juvenile dependency action was filed and pursued in juvenile court. At the hearing on January 31, 2013, Plaintiffs were represented by attorneys but "did not challenge the Agency's recommendation that the children remain outside the home, nor did they cross-examine Ms. McCann, call any witnesses, or present any other evidence. Later in the juvenile dependency action, Plaintiffs did not present evidence, raise any claims regarding 'false or fabricated evidence,' or challenge the Agency's recommendation that the court take jurisdiction over the children. Instead, Plaintiffs waived their rights to challenge the juvenile court's orders, including its detention orders." (Individuals MSJ 37.) Indeed, Sheila executed a "Waiver of Rights" wherein she stated she wished to "submit the petition on the basis of the social worker's . . . report and other documents." (ECF No. 127, at 83.) This form noted that she was giving up certain rights.

In response, Plaintiffs state Defendants are arguing that Plaintiffs' claims are barred by the *Rooker-Feldman* doctrine. (Pl. Opp'n to Individ. 43); *see D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). Under this doctrine, federal district courts may not exercise appellate jurisdiction over state court decisions even when the challenge to the state court decision involves federal constitutional issues. *Noel v. Hall,* 341 F.3d 1148, 1163–64 (9th Cir. 2003) (holding that *Rooker-Feldman* doctrine applies "[i]f a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision"). Plaintiffs argue they are not appealing the Juvenile Court orders and thus their claims are not barred by *Rooker-Feldman*. The Court agrees, but, Plaintiffs have not addressed the entirety of Defendants' arguments. The Court must analyze whether Plaintiffs waived their right to make certain challenges due to their actions in the juvenile court proceedings (i.e., by not objecting and filing a waiver).

Signing a waiver of rights is not the same as agreeing to the allegations of the

petition. It merely means that the party does not wish to present evidence at the hearing and is willing to have the juvenile court decide the issues based on the social worker's reports and other information already presented to the court. *Rosa S. v. Superior Court*, 100 Cal. App. 4th 1181, 1196 (Ct. App. 2002). When a party submits to the findings, "the parent acquiesces as to the state of the evidence yet preserves the right to challenge it as insufficient to support a particular legal conclusion. Thus, the parent does not waive for appellate purposes his or her right to challenge the propriety of the court's orders." *In re Richard K.*, 25 Cal. App. 4th 580, 589 (Ct. App. 1994) (internal citations omitted). California Rules of Court provide a parent has options in this situation: "The parent or guardian may elect to admit the allegations of the petition or plead no contest and waive further jurisdictional hearing. The parent or guardian may elect to submit the jurisdictional determination to the court based on the information provided to the court and choose whether to waive further jurisdictional hearing." Cal. Rules of Court 4.682(d). The rules further provide that a parent "submits to the jurisdictional determination in writing" by completing form JV-190, as Sheila did here. After this submission, the court must still make a finding "[w]hether the allegations of the petition as submitted are true as alleged." Cal. Rules of Court 4.682(e)(8).

Sheila's execution of JV-190 does not constitute a waiver of her rights to challenge the social workers' evidence and statements, nor an admission that the petition was true. The form only precluded her from presenting evidence at the juvenile court hearing. The Court **DENIES** Individual Defendants' Motion for Summary Judgment on the claim of waiver.

### D. Injunctive Relief

Defendants move for summary judgment on Plaintiffs' claim for injunctive relief. (Individuals MSJ 47.) Plaintiffs respond that they do not request injunctive relief against the Individual Defendants. (Pl. Opp'n to Individ. 47.) The Court **GRANTS** the Individual Defendants' Motion for Summary Judgment for the claim of injunctive relief.

/ / /

### E. Punitive Damages

Plaintiffs' Complaint includes a prayer for punitive damages as against the Individual Defendants. (Compl. at 33.) Individual Defendants request the Court to enter summary judgment on this claim because Plaintiffs cannot prove punitive damages. (Individuals MSJ 48.) As set forth in the Ninth Circuit jury instructions, punitive damages may be awarded if "the defendant's conduct that harmed the plaintiff was malicious, oppressive or in reckless disregard of the plaintiff's rights."

The Court has found herein that Defendants Walsh, Palafox, and Quintanilla should be dismissed from this suit. Accordingly, the Court **GRANTS** Plaintiffs' request for punitive damages as to these three Defendants. Because the Court finds in this order that Defendants McCann, Huidor, and Salcido are not entitled to summary judgment on all of Plaintiffs' claims, the Court finds summary judgment is likewise inappropriate on Plaintiffs' prayer for punitive damages. Accordingly, the Court **DENIES** Individual Defendants' Motion for Summary Judgment as to Plaintiffs' request for punitive damages against Defendants McCann, Huidor, and Salcido.

## CONCLUSION

For the foregoing reasons, the Court rules as follows. First, the Court **DENIES IN FULL** Plaintiffs' Motion for Summary Judgment, except:

1. The Court defers ruling on the claims regarding examinations of the children at PCC.

The Court **GRANTS** the County's Motion for Summary Judgment as to:

1. Plaintiffs' claims regarding the County's training on safety at PCC;

2. Plaintiffs' claims they are no longer asserting (i.e., Coercive Conduct, Compl. ¶ 73(a); Removal from Custody, Compl. ¶73(d); and Intimidation, Compl. ¶ 73(h));

3. Plaintiffs' claims regarding policies of evidence fabrication and perjury, (Compl. ¶ 73(c), (e), and (g));

4. Plaintiffs' claims regarding a policy of conducting unconstitutional school interviews, (Compl. ¶ 73(j));

5. Plaintiffs' claims regarding policies of failing to notify parents, (Compl. ¶ 73(k));

6. Plaintiffs' claims regarding discipline of social workers, (Compl. ¶ 73(n)).

The Court **DENIES** the remainder of the Motion.


The Court **GRANTS** Individual Defendants' Motion for Summary Judgment as to:

1. Plaintiffs' claim of violation of Cassandra and CNG's Fourth Amendment rights due to unreasonable seizures;

2. Plaintiffs' claims against Defendants Walsh, Quintanilla, and Palafox;

3. Plaintiffs' claim of judicial deception against Defendant Salcido;

4. Plaintiffs' state law claims.

5. Plaintiffs' request for injunctive relief.

The Court **DENIES** the remainder of the Motion.

       **IT IS SO ORDERED.**

Dated: June 18, 2018

Hon. Janis L. Sammartino
United States District Judge